## NEWMAN et al. v. UNITED STATES.[*]

Circuit Court of Appeals, Ninth Circuit.
October 22, 1928.

No. 5471.

Paul Carrigan, of Seattle, Wash., for appellants.

Anthony Savage, U. S. Atty., and Jeffrey Heiman, Asst. U. S. Atty., both of Seattle, Wash.

Before . RUDKIN, DIETRICH, and HUNT, Circuit Judges.

DIETRICH, Circuit Judge.  The six appellants, with others, were charged with and convicted of entering into a conspiracy on or about February 15, 1927, to commit several of the offenses defined by the National Prohibition Act (27 USCA), and to introduce into the United States from Canada various alcoholic beverages, in violation of section 593(a) of the Tariff Act of 1922 (19 USCA § 496).  The evidence leaves no doubt that at the time and place alleged such an enterprise was actually set on foot, by which large quantities of intoxicating liquors were to be smuggled in, and the wholesale bribery of government agents was to be resorted to for "protection."  According to the testimony adduced for the government, the approach for protection was first made by appellant Newman, who had theretofore been engaged in illegal liquor transactions, to one Hubbard, and later to Hubbard and Fryant, both prohibition agents stationed at Seattle.  Feigning a sympathetic interest, they elicited from him the details of the scheme, and from time to time made official reports of their interviews.  Finally, with the approbation of their superiors, including the United States District Attorney, they simulated acceptance of the offer and to all appearances joined in

*Rehearing denied December 3, 1928.

carrying forward the enterprise. After thus learning of the actual participation of the other appellants in bringing in contraband liquor, and receiving considerable sums of money ostensibly for protection, they caused arrests to be made and this prosecution to be instituted.

Touching the scope of the conspiracy and what was done in effecting its purpose, including the use of money in procuring protection from the public officers, the testimony was in much circumstantial detail, but for reasons now to be stated analysis is deemed unnecessary. In their opening statement, after the jury was impaneled, counsel for the defendants announced that their "defense would be entrapment," and no other defense was suggested. The defendants themselves, in giving testimony in their own behalf, admitted the purpose and scope of the conspiracy substantially as charged, and that in furtherance of the unlawful scheme much was done in smuggling intoxicating liquor in large quantities from Canada into the United States. As indicative of the scope of the real issue we quote this language from defendants' closing brief:

"As we stated in our opening brief there was little or no controversy as to the things actually done and the acts actually performed in furtherance of the conspiracy, and the ultimate fact of guilt or innocence rested upon the credibility which the jury should accord to Hubbard and Fryant on the one side and the appellants and their witnesses, including the defendants who were acquitted, on the other side, upon the question of entrapment."

In short, defendants testimonially admit that for gain they deliberately engaged in a scheme, the execution of which they knew would involve, not only violation of the prohibition and tariff laws, but the odiously immoral incident of securing protection by the bribery of public officers. Their defense is that they were induced to go into it by Hubbard and Fryant, whom they knew to be government agents, and whom they believed to be corrupt and recreant to their official trust, and the only serious conflict in the testimony is upon the question whether they or these two agents took the initiative or leadership. It is a matter of grave doubt whether under such circumstances, even with this issue of fact resolved in their favor, they could avail themselves of the defense of entrapment. State v. Diegle, 21 Ohio Dec. 557, affirmed by Ohio Supreme Court, 86 Ohio St. 310, 99 N. E. 1125; People v. Liphardt, 105 Mich. 80, 62 N. W. 1022; Davis v. State, 70 Tex. Cr. R. 524, 158 S. W. 288; State v. Dougherty, 88 N. J. Law, 209, 96 A. 56, L. R. A. 1916C, 991, Ann. Cas. 1917D, 950; Hummelshime v. State, 125 Md. 563, 93 A. 990, Ann. Cas. 1917E, 1072. But, however that may be, the court submitted the issue to the jury under comprehensive instructions of which they did not, and do not, complain.

█ The only assignment they urge in respect to the subject of instructions concerns the failure of the court to give the following request:

"You are instructed that the testimony of accomplices in the commission of a crime is to be received with care and caution and must be closely scrutinized by the jury in determining the weight and credibility to be given to such testimony."

But, in the first place, the bare declaration in this form of an abstract principle could only have resulted in setting the jury adrift on a sea of speculation touching its applicability to any of the witnesses who gave testimony, and, in the absence of an explanation under or upon what conditions it should be applied to any designated witness, we think the giving of it might have been error. In the second place, if, as is to be inferred, defendants hoped that it would be considered by the jury as applicable, not to any one of their own number, but to Hubbard and Fryant, then it must be held to be inconsistent with the only defense they made, that of entrapment. In their closing brief they concede the position of the government that, if Hubbard and Fryant were in fact true to their official oaths, and hence were all the time acting as prohibition agents, and only feigning participation in the enterprise, they were not accomplices in law; but at the very foundation of the defense of entrapment is the necessary assumption that Hubbard and Fryant were all the time acting in their official capacity. The government is not bound by acts of persons who never have been, or in fact have ceased to be, its agents. And whether the doctrine of entrapment is made to rest upon the theory of estoppel, or upon considerations of public policy, or upon some other ground, it can be invoked only where the government is, through its officers or agents, chargeable with inducing the commission of the offense.

█ Complaint is made of the declination of the court to permit counsel for defendants to go beyond a certain range in cross-examining Hubbard concerning his former "occupation"; the real purpose being to show that at some prior time he had been engaged in bootlegging and kindred unlawful transactions. In view of the nature of the defense

and the admissions of defendants that they actually participated in the conspiracy, the materiality of the assumed fact is not apparent; but, aside from that consideration, admittedly the point is ruled by our decision in Charles Sawyear et al. v. United States, 27 F.(2d) 569, to which we adhere.

The other two specifications, that the court erred in declining to permit one of the attorneys to inquire of Hubbard upon cross-examination whether at a certain time he had registered under an assumed name, and in rebuking and fining the attorney in the presence of the jury, relate to the same incident, which is thus set forth in the record:

"Mr. Caldwell: Q. When you were over at Vancouver and put up in this fine suite of rooms you told us about, what date was that? A. That was on the 29th of March, I believe.

"Q. The 29th of March. You rode up there in Newman's car. A. I think we did, yes.

"Q. You registered under what name?

"Mr. Savage: Objected to as immaterial.

"The Court: Sustained.

"Mr. Caldwell: It shows that he was not acting openly.

"Mr. Savage: We object to the statement of counsel.

"The Court: Interrogate the witness.

"Q. (by Mr. Caldwell): Isn't it a fact you registered under the name of Kennard?

"Mr. Savage: We object to that. I thought the court sustained the objection.

"The Court: Yes. You put it that way for the purpose of evading the court's ruling. You are fined $50 for your conduct, which is disorderly and obstructive."

It is to be conceded that the use of an alias may sometimes properly be shown. For example, that one charged with an offense went under an assumed name in performing certain acts may be material, as importing a consciousness of wrongdoing which he desired to conceal. But that a detective, in procuring evidence of criminal activities, thus or otherwise seeks to conceal his identity, is manifestly without such significance, and it is not apparent how, under the circumstances here shown, it was material to know whether Hubbard registered under his own or an assumed name. We are therefore of the opinion that the rulings upon the two questions by which it was attempted to elicit the information were correct. The propriety of holding counsel in contempt for asking the second is a question involving additional considerations; but, if error in that respect be assumed, we are unable to believe defendants were in anywise prejudiced thereby. In Withrow v. United States (C. C. A. 4th) 1 F.(2d) 858, 860, cited and relied upon by defendants, because of its ruling under the distinctive facts of the case, the court uses the following language:

"The generally recognized rule is thus well formulated in note 42 L. R. A. (N. S.) 428: 'It is within the province of the court to rebuke or censure counsel in the presence of the jury for irregularity of practice or misconduct in the case. To warrant a reversal because of the conduct of the trial judge in rebuking or punishing an attorney during the trial, it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party.'"

General language may be found in a few cases seemingly holding that any punishment or severe rebuke of counsel in the presence of the jury is presumed to be prejudicial to his client. We are unable to take that view. It seems to us to underrate the intelligence and poise of jurors. Common observation does not lead us to think that the ordinary citizen, whether on or off the jury, idealizes the function of counsel in a criminal trial or apotheosizes the judge. Were such his conception, all adverse rulings would be taken as implying criticism or rebuke. Jurors realize that, his compelling desire being for the success of his client, counsel may in his zeal be unduly insistent, and by overstepping the line of propriety may incur rebuke. But such incidents we are inclined to think are taken as a matter of course, and do not, except under extraordinary circumstances, influence the jurors upon the question of defendant's guilt or innocence. A juror of moderate intelligence would know that the incident here was without material bearing on the issues he must decide. And it had no apparent effect upon counsel; he thereafter pursued the cross-examination of Hubbard to great length, and asked questions to which objections were properly sustained, frequently not because of the immateriality of their subject-matter, but because of their assumptions or innuendoes. We think it is clearly a case for the application of the rule of section 269 of the Judicial Code (28 USCA § 391), declaring that appellate courts shall give judgment "without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

Affirmed.