# BROWN *v.* STATE

[No. 174, October Term, 1951.]

*Decided May 9, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*R. Palmer Ingram*, with whom was *Malcolm J. Coan*, on the brief, for appellant.

*J. Edgar Harvey*, Deputy Attorney General, with whom were *Hall Hammond*, Attorney General, and *Anselm Sodaro*, State's Attorney for Baltimore City, on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a conviction by the trial judge, without a jury, for unlawfully and knowingly permitting a certain room to be used as a place for selling lottery tickets on July 28, 1951. The question before this Court is whether the trial judge was clearly wrong under the evidence in finding the appellant guilty of the crime charged.

The indictment also jointly charged one Washington Brailey with various violations of the lottery laws. Officer John Livesay, called as a witness by the appellant, testified that he was detailed by Captain Emerson to make observations at the premises, 230 North Vincent Street, Baltimore. He observed about noon on July 26, 1951, five colored men and three colored women entered the rear of the premises. About 12:45 P. M. a colored man got out of an automobile some distance away and entered in the rear of the premises by a back way. In a short time he returned to the car and another

colored man approached him and gave him a brown paper bag which he opened and from which he opened and from which he removed "some yellow conventional lottery slips." He looked at them, left the car, walked back and entered the premises, stayed there a few minutes, returned and left the vicinity. About noon on July 27, 1951, he saw five colored men and two colored women, most of them being the same people he had observed on the previous day, go into the premises and remain only a few minutes each time. Most of them carred small brown paper bags. About 12:45 P.M. the same automobile driven by the same man drove up and parked in the same location as on the previous day. By the same route the driver entered the premises, carrying a brown bag. He stayed a short time and left. During all of these observations he did not see the appellant, Norman Brown. The appellant did not testify.

For the State, evidence was offered to show that on July 28, 1951, with a search warrant, Captain Emerson, accompanied by Officers Bradley and Snyder, entered the premises described, which was a dwelling house. The front room was "a kind of living room with a lot of storage and junk piled up in the room". The next room downstairs was a "sort of dining room" and kitchen. As the officers entered the front room, Washington Brailey threw something to the side of him where there was a fishing net. In the fishing net were found lottery books showing $40.30 played. Brailey said that Norman Brown and himself and another person used the net that morning about four o'clock for fishing. In a stove on the north side of the front room were found two lottery tapes showing $59.59 played. In the dining room and kitchen on top of cans in the ice box was a new lottery book with no writing in it. Brailey said he did not know how they got there, that he knew nothing about them. In Brailey's bedroom on the second floor in a bureau drawer was found a lottery syndicate card. In Norman Brown's room on the second floor were found some clips, a switch blade knife, and a few rubber

bands. Also in this room were found some brown paper bags described by Captain Emerson as follows: "All of these brown paper bags, one of them has 'J.J.' on it it was right down by the outboard motor that was lying there on the floor, and this one has 'J.J.' in red and all of them has different writings, this has got a lot of figures on it. This has 801 and H-u-k-h-e-s and it's got 1409, it's got 10G. This one's got 'W.O.' this has got Miss Dolores, 250. Part of an envelope with 'B.S.' 20, and Gilmor 7270 J." The appellant was seen nowhere on the premises. Captain Emerson left word for the appellant to come to the police station. When he failed to appear a warrant was secured for him several days later. Appellant admitted the ownership of the premises and that Washington Brailey roomed there with him. Captain Emerson further testified as follows: "I asked him, you are Norman Brown. He said yes. I said do you live at 230 North Vincent Street. He said I do. I said who is Washington Brailey. He said he has been rooming with me for a long time. I said where did you go—was you fishing with him. He said I was. I said I recovered two lottery books out of the fishing net. He said yes, we used that. I said well what was the lottery books doing in there. He said I don't know nothing about the lottery books. I said there was one back in your icebox or cabinet on top of some cans, a brand new book. He said I don't know nothing about it. I said what time did you get home that morning. He said it was late in the morning. He said I think it was about 5:00 o'clock in the morning when we got home. I said what time did you leave there. He said I think it was about 10:30 in the morning. I asked him why didn't you come down here. He said I talked to some police and they didn't say nothing to me. He said that is why when I found out about it I came down." Captain Emerson said he does not remember asking appellant about the bags found in his bedroom.

Here appellant admitted that he had used the ·fish net that morning, that he was the owner of the premises,

that the room where the paper bags were found was his bedroom, and that Brailey roomed with him. There was no evidence that Brailey rented any part of the premises other than the bedroom. In the case of *Moore v. State*, No. 147, This Term, 199 Md. 676, 681, 87 A. 2d 577, 597, the appellant, Susie Moore, was charged among other things with unlawfully and knowingly permitting an automobile to be used as a place for selling lottery tickets. She contended that there was no legally sufficient evidence to connect her with the unlawful use of her automobile by one Carlos Cooper who was in the car at the time lottery slips were found therein. This Court said in that case: "There is, of course, no direct testimony of her participation in the lottery, but it is not necessary in order to support a conviction under these counts that she be shown to be a principal; all that need be shown is *scienter*, or in other words, that she was aware of, or permitted the unlawful use by Cooper, in what was obviously a large and lucrative operation. We think a permissible inference may be drawn that she knew all about Cooper and his business. * * * As stated in the recent case of *Hayette v. State*, 199 Md. 140, 145, 85 A. 2d 790, 792: 'Ordinarily disbelieving evidence is not the same thing as finding evidence to the contrary. But on questions of *scienter* reason for disbelieving evidence denying *scienter* may also justify finding *scienter*. *Shelton v. State*, 198 Md. 405, 411-412, 84 A. 2d 76, 80.' "

Rule 7 (c) of the Criminal Rules of Practice and Procedure provides that in a criminal case tried without a jury, on appeal to this Court, we may review the law and the evidence but that the verdict of the trial judge "shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Here the appellant owned and occupied as his dwelling the premises searched. In his living room, his kitchen and dining room and in his bedroom were found paraphernalia used in gambling

operations. Brailey was only a roomer. From the testimony of Officer Livesay, called by the appellant as to his observations on two preceding days, this appeared to be a large operation. We cannot say that the trial judge was clearly wrong in finding *scienter* on the part of the appellant as to the unlawful activities of his roomer. *Edwards v. State,* 198 Md. 132, 83 A. 2d 578.

*Judgment affirmed, with costs.*