FERRARO ET AL. *v.* STATE
(Three Appeals in One Record)

[No. 181, October Term, 1951]

*Decided June 12, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*James C. Burch,* with whom was *Michael F. Delea* on the brief, for the appellants.

*Kenneth C. Proctor, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *William C. Rogers, Jr., Assistant State's Attorney,* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

These are three appeals from judgments on convictions, of violating gaming laws and conspiracy to violate the gaming laws, in three cases tried together before Judge Sherbow without a jury. Appellants were each convicted of making and selling a football pool, and becoming the depository of money to be bet; both, together with one Vallario, were convicted of conspiracy. Vallario pleaded guilty of violating gaming laws.

On the evening of November 9, 1951 John W. Heineman was arrested at the Century Bowling Alleys, and handed Officer Serio money (thirty-seven dollars) and seventy-two "pools". He remarked to the police lieutenant, "Why should I take the rap for the ones behind me?" Evidently he decided not to. Apparently he has not been convicted or indicted. He made appointments by telephone to meet Patti at half past nine that evening at Twentieth and Hope Streets and Ferraro at half past eleven at a restaurant on Harford Road. He testified that he had known appellants about ten years and Vallario about five years; he had been writing football pools in 1950 and 1951 for appellants and Vallario. He made turn-ins at Twentieth and Hope Streets and at home to

Vallario; Farraro, and Patti once or twice, used to make pick-ups too.

Officer Serio testified that he gave Heineman marked money (serial numbers taken) and football pools that he had previously taken from Heineman. The football tickets were wrapped over the money. Serio and Heineman were standing at opposite corners of Twentieth and Hope Streets. A car pulled up, Heineman got in and handed the tickets and money to Patti. Serio saw Heineman hand them to Patti, and Patti grabbed them with his left hand. When Serio got around to the driver's door he opened the door and said, "Give me them tickets", and they dropped between Heineman and Patti. Patti said, "He didn't give me anything". They were recovered from the floor of the car. A search of Patti's car revealed some unused football lottery tickets (blanks) and baseball tickets.

About midnight a car pulled up at Federal Street and Harford Road. Heineman still had the same money and tickets. He got in the car, had the money and tickets in his right hand and handed them to Ferraro. When Serio opened the door Ferraro had just taken his hand away from his left hand pocket. The officers got him out of the car. Serio told him to give him the stuff that Heineman had given him. Ferraro said, "I don't have nothing". The officers recovered the tickets and the money. Ferraro said, "The money is mine." Serio said, "How about the football tickets?" Ferraro said, "You put them in there". The next morning Serio and another officer went to Heineman's house. The marked money and football tickets were lying on the kitchen table. The doorbell rang and Vallario came in. Vallario and Heineman went into the front room. A moment later, when the officers went in, Vallario had the tickets and money in both hands counting them. Vallario said, "Here they are, you have got me."

Vallario testified he had known appellants for many years but they had nothing to do with his football enterprise.

Patti testified that he had known Heineman six or seven years, they had bowled together. On the evening of November 9, 1951 Heineman telephoned him he wanted to get in touch with Vallario, he had urgent business with Vallario, and if Patti happened to see Vallario to tell him to meet Heineman at Twentieth and Hope Streets at 9:30. Patti went out, looking for Vallario, but didn't see him. He "figured" he better go to the corner and tell Heineman he couldn't see Vallario. He never made any arrangements with Heineman to accept any lottery play. Heineman did not give him the package with the money, it was in his hand, and it did not drop to the floor. Patti never had any dealings with Heineman or Vallario or anyone else so far as these football tickets are concerned. He did not know anything about unused tickets found in the car. He cannot account for their being found there.

Ferraro testified that he worked for an insurance company; he had had a silent phone for only about two weeks. He doesn't know how Heineman got the number. He was in bed when Heineman called him. Heineman said he wanted to get in touch with Vallario. Ferraro said he didn't know where Vallario was. Heineman said he had to go to work and had to get in touch with Vallario, he had some money to give him. Ferraro said he would do him a favor, he would come down and give him the money, "so I left, put my pants on, went down, saw him at the corner of Federal Street, and as he got in the car he handed me—." Heineman did not tell him over the telephone that there were lottery, football tickets, in the transaction. He never had any dealings with Heineman or Vallario regarding football tickets.

If appellants could be believed, two Good Samaritans have met a cruel fate. But we cannot say that Judge Sherbow was clearly wrong in not believing them. This statement needs no elaboration. Several times recently we have remarked that reason for disbelieving evidence denying scienter may also justify finding scienter. *Brown v. State,* 200 Md. 211, 88 A. 2d 469, and cases cited.

At the close of the State's evidence appellants' counsel said, "I would like to make a motion, your Honor, on the theory of entrapment insofar as Ferraro and the other boy are concerned." This motion was overruled. Presumably this meant—if it meant anything—a motion for a verdict of "not guilty" on the ground that the evidence is legally insufficient to justify conviction. The motion was not renewed at the close of all the evidence. Rule 7(b) permits such a motion but does not require it as a condition of full review on appeal under Rule 7(c). *Diggins v. State*, 198 Md. 504, 84 A. 2d 845.

This court has never directly passed upon the defense of entrapment, because the question was not presented by any ruling in the record. *Hummelshime v. State*, 125 Md. 563, 570, 93 A. 990; *Callahan v. State*, 163 Md. 298, 302, 162 A. 856. Before the Criminal Rules of Practice and Procedure this court did not on appeal review the facts in a criminal case tried by a jury—or by the court "sitting as a jury". Under Rule 7(c) this court now reviews the facts in a case tried by the court "without a jury". In *Hummelshime v. State, supra*, this court recognized the defense of entrapment only in cases where consent eliminates some essential element of the crime, *e.g.*, larceny. In *Callahan v. State, supra*, 301-302, this court said, "There was, however, no testimony of an entrapment within the rule adopted in some jurisdictions, since there existed reasonable suspicion on the part of the officers that the party was engaged in the unlawful sale of intoxicating liquor at the time it was ordered. *Cornelius on Search and Seizure*, sec. 39. It is not objectionable for an officer of the law to lay a trap or unite with others to detect an offender. The only effect would be to justify a more careful scrutiny of the evidence. Where the crime is not against the person nor the property of the instigator, it is not clear how, in the absence of special circumstances, the commission of a crime at the solicitation or procurement of another, although an officer of the law, makes the culprit any less guilty than if the criminal design had originated

with the wrongdoer himself, * * *." In *Sorrells v. United States*, 287 U. S. 435, 53 S. Ct. 210, 77 L. Ed. 413, the Supreme Court, Mr. Justice McReynolds dissenting, reversed a conviction of sale of liquor on account of unlawful entrapment. The opinion of the court, by Chief Justice Hughes, quoting Judge Sanborn in *Butts v. United States*, (C.C.A. 8th) 273 Fed. 35, 38, 18 A. L. R. 143, holds that "it is unconscionable, contrary to public policy, and to the establishment law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." *Supra,* 287 U. S. 444-445, 53 S. Ct. 214. After reviewing the evidence, the opinion says, "It is clear that the evidence was sufficient to warrant a finding that the act for which defendant was prosecuted was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it but was an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation in which he succeeded by taking advantage of the sentiment aroused by reminiscences of their experiences as companions in arms in the World War." *Supra,* 287 U. S. 441, 53 S. Ct. 212. The opinion also says, "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. [Citing many cases.] The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates

with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." The judgment was reversed and the case remanded for submission of the defense of entrapment to the jury. A separate opinion of Mr. Justice Roberts (concurred in by Mr. Justice Brandeis and Mr. Justice Stone) favored reversal with instructions to quash the indictment and discharge the defendant. The two opinions proceed on radically different lines and each vigorously combats the reasoning of the other. In Mr. Justice Roberts' opinion it is said, "It has been generally held, where the defendant has proved an entrapment, it is permissible for the government to show in rebuttal that the officer guilty of incitement of the crime had reasonable cause to believe the defendant was a person disposed to commit the offense. This procedure is approved by the opinion of the court." *Supra,* 287 U. S. 458, 53 S. Ct. 219. We do not find this stated in terms in the majority opinion (as it is in the opinion of this court in *Callahan v. State, supra*) but it may be implied, *e.g.,* in a statement that "if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon the issue." *Supra,* 287 U. S. 451, 53 S. Ct. 216.

We do not find it necessary to decide which, if any, of the divergent views of the defense of entrapment is law in Maryland. We think there is no evidence legally sufficient to support the defense of entrapment—on any accepted theory—certainly not to support a peremptory verdict of acquittal. If appellants' testimony were believed, there would be no guilt on their part and no entrapment. If their testimony is not believed, the activity of the police and their tool Heineman was "permitted activity, frequently essential to the enforcement of the law" and had "the appropriate object" of "revealing the criminal design". This activity was no more unlawful or improper than the use of decoy letters to trap mail

thieves or users of the mail for obscene matter. In the two expeditions on the night of November 9th there was no pressure or inducement to lure an innocent man into crime, but only a shrewd and proper test to determine whether Heineman's information was true or appellants were innocent.

Appellants contend that their conviction cannot stand on the uncorroborated testimony of Heineman, an accomplice. *Swann v. State,* 192 Md. 9, 10, 63 A. 2d 324. We may assume, without deciding, that Heineman was an accomplice, not only in his previous relations with appellants but also with respect to the activities on the night of November 9th. But see, as to the latter, *Grimm v. United States,* 156 U. S. 604, 610-611, 15 S. Ct. 470, 39 L. Ed. 550, and cases cited. The testimony of Officer Serio as to the activities that night is ample corroboration of Heineman. The improbabilities in appellants' own testimony are further corroboration. *Supra.* Judge Sherbow was not asked to rule on this question, and under Rule 7(a) was authorized to render his verdict without comment.

*Judgments affirmed, with costs.*