## LAWRENCE WILBUR HALL *v.* STATE OF MARYLAND

[No. 549, September Term, 1980.]

*Decided February 5, 1981.*

The cause was submitted on briefs to MORTON, THOMPSON and MOORE, JJ.

Submitted by *Gilbert H. Robinette, Assigned Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Patricia E. McDonald, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Barry A. Hamilton, Assistant State's Attorney for Montgomery County,* for appellee.

THOMPSON, J., delivered the opinion of the Court.

Lawrence Wilbur Hall, the appellant, was convicted by the Montgomery County Circuit Court of carrying a handgun, but the jury was unable to reach a verdict on the other counts of the indictment. A presentence investigation was ordered and the appellant was sentenced. Subsequently, he was retried on those charges upon which the first jury had been unable to agree and was convicted of assault with intent to rob and use of a handgun in the commission of a felony. This appeal is from the judgments entered at the second trial.

## FACTS

On March 6, 1979, Willard and Lorraine Sheppard, along with their son, Stanley, were present in their Bethesda jewelry store, when, at about 11:15 a.m., a well-dressed black man came to the door. The door, which was equipped with a lock operated by means of a buzzer, was opened by Stanley Sheppard and the man entered the store. Once inside, the man produced a pistol and announced: "This is a holdup." Seconds later, another black man, identified at trial as the appellant, walked up to the door and stood there, looking in. The man inside the store, while pointing his weapon at the Sheppards, backed towards the door and attempted unsuccessfully to open it. He then demanded that the Sheppards press the buzzer to release the lock and admit the appellant; the Sheppards refused. Apparently while the gunman was distracted by his attempt to open the door, Stanley Sheppard escaped to the basement beneath the store. Willard Sheppard then seized a pistol which was hidden in a cabinet and fled towards the basement. As he did so, the man inside the store fired his pistol, wounding Mr. Sheppard in the back. Mrs. Sheppard then pressed the buzzer, releasing the lock and the gunman went out the front door. Mrs. Sheppard testified that the gunman, after stepping outside, paused for a moment with the appellant,

who had remained standing at the door throughout the incident. The two then turned and walked in opposite directions.

Willard and Stanley Sheppard emerged from the basement and went in search of the robbers. Approximately a block away, they observed the appellant standing near a bus stop. Stanley Sheppard flagged down a policeman and directed his attention to the appellant, who was at that time attempting to enter a taxicab. The policeman approached the appellant, ordered him to put his hands on top of the cab, and frisked him. The appellant was carrying an empty briefcase and had a fully loaded revolver in the pocket of his coat. His alleged accomplice in the robbery, the man who entered the store and shot Mr. Sheppard, was neither apprehended nor identified.

The appellant testified, admitting glancing into the jewelry store but stating that he moved on after three or four seconds. He stated that he was not aware that a robbery was in progress, although he saw the robber standing inside. He denied seeing anyone come out of the store. He claimed he was attempting to catch a cab to return to his home in downtown Washington when he was arrested. He stated that he was in Bethesda on the day of the robbery in order to look for a new job and that he carried the empty briefcase to make a better impresson on prospective employers. He had previously been convicted for receiving stolen property as a result of an unrelated incident.

Of crucial importance was the testimony which the appellant offered to explain why he was carrying a handgun at the time of his arrest. He claimed that he was employed as a night delivery man for a downtown pizza shop and that, during the course of his employment, he had been robbed on several occasions. He claimed that he carried the weapon while on his job for his protection and that he was carrying the gun at the time of his arrest because he had neglected to remove it from his coat pocket after working the previous night. On cross-examination, the appellant was asked whether he recalled a conversation which he had had with one Louis Monk on December 18, 1979. Initially, the appellant indicated that he did not; he then stated that he recalled

the conversation but did not know the name of the man he had talked to. He was asked specifically whether he had told Monk that he had been unemployed for two months prior to his arrest; he answered that he had not. The court was advised during a bench conference that Louis Monk was the probation officer who had conducted the presentence investigation following appellant's conviction at the first trial and that Monk would testify that the appellant had made a statement, during the presentence investigation, concerning his employment history which conflicted with his testimony at trial. The state was permitted to call Mr. Monk in rebuttal and question him concerning the inconsistency. He testified that the appellant had told him that he, the appellant, had been unemployed from January through April, 1979. Although the presentence report was not entered into evidence, Mr. Monk, during the course of his testimony, made the statement: "[T]his is straight from the presentence investigation."

## I Admission of Monk's Testimony

Appellant's first contention is constitutional in nature. He argues that permitting the state to impeach his testimony with statements he made to the probation officer conducting the presentence investigation violated his Sixth Amendment right to the assistance of counsel.

In *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), where the "Court first applied the Sixth Amendment to post indictment communications between the accused and agents of the government," *United States v. Henry,* 447 U.S. 264, 100 S. Ct. 2183, 2186, 165 L. Ed. 2d 115 (1980), it was held that "the petitioner was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206. In *Massiah,* the petitioner's co-defendant, who had secretly agreed to cooperate with the government in its investigation, permitted a

government agent to install a listening device in his car. By means of this device, the agent was able to listen to a conversation between the petitioner, who had been indicted and released on bail, and the co-defendant in which the petitioner made a number of incriminating statements. The agent testified concerning these statements at petitioner's trial.[1]

In *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), the Court held inadmissible a confession extracted from a suspect who requested and was denied the opportunity to consult with his attorney during a police interrogation. The Court held "that when the process shifts from investigatory to accusatory — when its focus is on the accused and its purpose is to elicit a confession — our adversary system begins to operate, and under the circumstances here, the accused must be permitted to consult with his lawyer." 378 U.S. at 492.

In *Brewer v. Williams,* 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977), the facts of which were held to be "constitutionally indistinguishable from those presented in *Massiah* . . . ," 430 U.S. at 400, the Court again found a violation of a prisoner's Sixth Amendment right to counsel. There, Williams, while under arrest and being transported by police, led police to the location where he had left his victim's body, as well as to the locations where he claimed to have abandoned various pieces of evidence. The court found that he did so in response to a police detective's now famous "Christian burial speech," which was "tantamount to interrogation." 430 U.S. at 400. This interrogation was carried out while Williams was alone in the police vehicle with two police officers, at a time when Williams had retained counsel and when the officers had agreed that they would ask Williams no questions during the drive. The Court found that the policeman "*deliberately and designedly set out to elicit information* from Williams . . . [;] . . . he purposely *sought* during Williams' isolation from his lawyers

---

1. For further discussion of Massiah v. United States, *see* State v. Blizzard, 278 Md. 556, 366 A.2d 1026 (1976).

*to obtain* as much *incriminating information* as possible." (emphasis added). 430 U.S. at 399.

Most recently, in *United States v. Henry, supra,* the Court considered whether Henry's Sixth Amendment right to the assistance of counsel was violated by the admission at his trial of incriminating statements which he had made, after indictment and while in custody, to a fellow prisoner, an undisclosed government informant. The Court viewed the question before it as "whether under the facts of this case, a government agent 'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah."* 447 U.S. at 270, 100 S. Ct. at 2186. In its consideration of this question, the Court rejected the government's contention that *Brewer* had in some way modified the "deliberately elicited" test set forth in *Massiah.* 447 U.S. at 271, 100 S. Ct. at 2187. *See also, Rhode Island v. Innis,* 446 U.S. 291 at 300 n.4, 100 S. Ct. 1682, at 1689 n.4, 64 L. Ed. 2d 297 (1980). The majority concluded: "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the government violated Henry's Sixth Amendment right to counsel." (footnote omitted). 447 U.S. at 274, 100 S. Ct. at 2189.[2]

These decisions of the Supreme Court of the United States rest upon a common foundation: in each there was deliberate elicitation by the government of incriminating statements from a defendant who was either under indictment or in custody, at a time when the defendant had been in some manner separated from his counsel. In each instance, the defendant was induced to make a statement which the government sought for the specific purpose of convicting him of the crime for which he was then either under indictment or in custody. It is this conduct which the Supreme Court has held to be prohibited by the Sixth Amendment. *See, United*

---

2. *Cf.,* Leuschner v. State, 41 Md. App. 423, 397 A.2d 622, *cert. denied,* 285 Md. 731, *cert. denied,* 444 U.S. 933 (1979) (undercover police officer, posing as a wanted criminal, placed in defendant's jail cell to listen for incriminating admissions; held: no violation of defendant's Sixth Amendment rights where officer testified that he asked defendant no questions and that defendant's statements were "volunteered.")

*States v. Garcia,* 377 F.2d 321, 324 (2d Cir.), *cert. denied,* 389 U.S. 991 (1967) ("*Massiah* . . . only protects against deliberate efforts of law enforcement agents which are specifically aimed at eliciting incriminating statements relative to the crime under indictment.") The government's intent is crucial.

In the case at bar, the trial court, in overruling the appellant's objection to the introduction of Monk's testimony, made the following observation: "[T]he question [i.e., Monk's question concerning the appellant's employment history] was not asked for the purpose of obtaining information for use in this case. . . . [T]he State did not undertake any subterfuge, did not intentionally act to deprive the defendant of his right to counsel . . . ." We concur in this analysis and find that it distinguishes the instant case from those decisions which we discussed above. Here, there was no deliberate elicitation of incriminating information; the state's purpose in conducting the presentence investigation was not to accumulate evidence for use at the appellant's second trial. We note that there is no reason to believe that Monk, at the time he conducted the presentence investigation, was even aware that the appellant would be retried. There is no basis for concluding that Monk should have expected to obtain incriminating information in the course of the investigation. *Cf., Rhode Island v. Innis, supra.* (Fifth Amendment challenge to admission of incriminating statement on facts similar to those in *Brewer;* statements held admissible: "[T]he respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." 446 U.S. at 303, 100 S. Ct. at 1691). There is no evidence which suggests that the state contrived to separate the appellant and his counsel or to conduct the interview at a time when appellant's counsel was not present. The record reflects that appellant's counsel was well aware of the interview; there is at least one reference which indicates that counsel may have taken him to the interview.[3] We find

---

3. While the jury was out of the courtroom, defense counsel stated: "[I]t never occurred to me that when I took him up to the Department of Parole

no basis here for concluding that the state, through Monk, deliberately elicited incriminating information from the appellant. We therefore hold that the introduction of Monk's testimony did not violate appellant's Sixth Amendment right to have the assistance of counsel.[4]

and Probation. and when he went himself. that this was going to be occurring."

4. In determining that Monk's testimony was admissible, the trial court relied upon Oregon v. Hass, 420 U.S. 714, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975), and Harris v. New York, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), which hold that evidence which, under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is inadmissible in the government's case in chief as substantive evidence of guilt, may nevertheless be used for impeachment purposes when the accused takes the stand.

In Hass, the Supreme Court stated:

"This case presents a variation of the fact situation encountered by the Court in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971): When a suspect, who is in the custody of a state police officer, has been given full Miranda warnings and accepts them, and then later states that he would like to telephone a lawyer but is told that this cannot be done until the officer and the suspect reach the station, and the suspect then provides inculpatory information, is that information admissible in evidence solely for impeachment purposes after the suspect has taken the stand and testified contrarily to the inculpatory information, or is it inadmissible under the Fifth and Fourteenth Amendments?" (footnote omitted). 420 U.S. at 714-15.

"As in Harris, it does not follow from Miranda that evidence inadmissible against Hass in the prosecution's case in chief is barred for all purposes, always provided that 'the trustworthiness of the evidence satisfies legal standards.' 401 U.S., at 224, 91 S.Ct., at 645. Again, the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, 'the benefits of this process should not be lost,' id.. at 225, 91 S.Ct., at 645; and again, making the deterrent-effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief. If all this sufficed for the result in Harris, it supports and demands a like result in Hass' case. Here, too, the shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." 420 U.S. at 722.

The principles set forth in Harris and Hass, that evidence otherwise inadmissible under the Fifth Amendment may be used for impeachment purposes, has also been applied by the Supreme Court to evidence otherwise inadmissible under the Fourth Amendment. See, United States v. Havens, 446 U.S. 620, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980); Walder v. United States, 347 U.S. 62, 74 S. Ct. 354, 98 L. Ed. 503 (1954).

In all of these cases the trial judge had given an instruction limiting the use of the testimony to impeachment purposes. It would appear that the same reasoning which was applied to admit the impeaching evidence would

The appellant also contends that "his Fifth Amendment right to remain silent was violated due to the judicial compulsion to speak to Monk . . . ." He cites no authority which supports this proposition and we know of none. We find no basis in the record for a claim that the appellant's statement was in any sense "compelled." Cf., Hoffa v. United States, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966).

## II Motion for Mistrial

Following Mr. Monk's reference, during the course of his testimony to "the pre-sentence investigation," appellant moved for a mistrial. His second contention is that the court below erred in refusing to grant his motion. Prior to placing Monk on the stand, the State's Attorney stated that he intended to have Monk testify without revealing to the jury that the appellant had made the contradictory statement during the course of a presentence investigation. His purpose in so doing was to insure that the jury not learn of the appellant's prior conviction for carrying a handgun. The court sanctioned this procedure and overruled the appellant's objection to the proffered testimony. Although the State's Attorney had instructed the witness to pay careful attention to his questions and to answer only the precise question asked, he had scarcely begun to examine Monk when the following occurred:

"Q. And, what did he tell you about his employment during those two years?

A. Okay. From this — again this is straight from the pre-sentence investigation. From 1976 to 1978 —"

The appellant immediately moved for a mistrial. The court responded:

---

also permit its use as substantive evidence if that question had been before the Court in those cases, assuming of course, the accused first denied having made the statements. We need not and do not rest our decision on this basis.

"The Court: The Motion will be denied. It is just not — it is the whole setting and the context of the case, particularly where the defendant has been on the stand and asked about his prior record, and the only prior record he has that was gone into had to do with receiving of a . . . [stolen bicycle].

Mr. Hamilton: In 1977.

The Court: For all they [the jury] know, somebody does a pre-sentence investigation report when a man is charged before he goes to trial."

In *Wilhelm v. State,* 272 Md. 404, 429, 326 A.2d 707 (1974), the Court said:

"A request for a mistrial in a criminal case is addressed to the sound discretion of the trial court and the exercise of its discretion, in a case involving a question of prejudice which might infringe upon the right of the defendant to a fair trial, is reviewable on appeal to determine whether or not there has been an abuse of that discretion by the trial court in denying the mistrial. [citation omitted]. The decision by the trial court in the exercise of its discretion denying a mistrial will not be reversed on appeal unless it is clear that there has been prejudice to the defendant."

As we stated in *Johnson v. State,* 18 Md. App. 571, 575, 308 A.2d 426, *cert. denied,* 270 Md. 740 (1973): "We must give consideration to the fact that the lower court in the trial setting is in a much better position to assess the prejudicial effect, if any, of the occurrence prompting the motion." *See also, Wilhelm v. State, supra* at 429:

("[R]ecognition must be given to the fact that the trial judge, who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and assess — in the context in which the remarks are made and their relationship to other factors in the trial — whether they were in fact prejudicial.")

In the case at bar, the trial court determined that, in the context in which it was made, the witnesses' reference to "the pre-sentence investigation" was not prejudicial and was, in all likelihood, considered by the jury to be meaningless. We agree that there was no prejudice to the appellant and therefore find no abuse of discretion in the denial of appellant's motion for a mistrial.

## III  Sufficiency of the Evidence

The appellant's final contention is that the evidence adduced at his trial was insufficient to sustain his conviction. "The test of the sufficiency of the evidence has been established as being whether the evidence either shows directly, or supports a rational inference of, the facts to be proved, from which the trier of fact could fairly be convinced beyond a reasonable doubt, of the defendant's guilt of the offense charged." *Metz v. State,* 9 Md. App. 15, 20, 262 A.2d 331 (1970). In the instant case, the appellant was identified as the man who came to the front door of the jewelry store and stood there for perhaps a minute or more while the robber inside the store, with gun in hand, attempted to open the door to admit him. After the wounding of Mr. Sheppard, the gunman and the appellant stood together outside the store for a moment or two, as if conferring. He and the gunman then fled the scene of the crime. When the appellant was arrested, he was carrying an empty briefcase and a loaded revolver. His explanation for carrying the revolver, i.e., that he had neglected to remove it from his coat after work, was impeached by his prior statement to Mr. Monk that he was unemployed prior to and at the time of the attempted robbery. If the jury chose to believe Monk's testimony, then the appellant's false testimony at trial could be considered by the jury as evidence of scienter, or guilty knowledge. *See, King v. State,* 201 Md. 303, 309, 93 A.2d 556 (1953); *Hayette v. State,* 199 Md. 140, 145, 85 A.2d 790 (1952); *Marini v. State,* 30 Md. App. 19, 30, 351 A.2d 463, *cert. denied,* 277 Md. 739 (1976); *Carter v. State,* 10 Md. App.

50, 55, 267 A.2d 743 (1970). The evidence presented, particularly the victims' testimony concerning the appellant's appearance and behavior outside the jewelry store door, established considerably more than his mere presence at the scene of the crime. *Cf., In Re Appeal No. 504,* 24 Md. App. 715, 725, 332 A.2d 698 (1975); *Woodard v. State,* 16 Md. App. 300, 304, 295 A.2d 789 (1972). We hold there was sufficient evidence for the jury to rationally infer the appellant's criminal intent.

> *Judgments affirmed.*
> *Appellant to pay the costs.*